# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 18, 2024

Lyle W. Cayce
Clerk

————————

No. 24-60134

————————

Blanca Nelly Sarabia Villareal,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

————————————————————

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A206 994 129

————————————————————

Before Ho, Engelhardt, and Douglas, *Circuit Judges*.
Per Curiam:[*]

Blanca Nelly Sarabia Villareal petitions this court to review the Board of Immigration Appeals' ("BIA") denial of her motion to reopen her removal proceedings. In that motion, Villareal argued that she received ineffective assistance of counsel during removal proceedings before an immigration judge and the BIA, and that her counsels' errors led to an order

——————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-60134

for her removal. Because the BIA did not abuse its discretion in denying Villareal's motion, the petition is DENIED.

## I.

## A.

Villareal is a native and citizen of Mexico. She legally entered the United States in 2005 as a nonimmigrant visitor but overstayed her visa. In 2012, Villareal married a United States citizen. This marriage made her eligible to adjust her status to that of a lawful permanent resident. She did not immediately seek this adjustment, however.

In May and June of 2014, Villareal engaged in an organized and calculated criminal enterprise to steal and resell merchandise from Walmart in Harris County, Texas. She personally engaged in nineteen different transactions at Walmart, through which she obtained $7,916.25 in merchandise that she did not pay for. She also recruited her brother and husband to do the same, and together they stole $12,318.51 in merchandise, through a total of thirty-nine transactions, to sell at a flea market. They executed this scheme with two of Villareal's children present.

This operation came to an end on June 17, 2014, when Walmart loss detention associates caught Villareal in the act. The associates called the police, who then arrested Villareal, her husband, her brother, and a Walmart cashier. The State of Texas charged Villareal with Engaging in Organized Crime, and she pled guilty on May 14, 2015, to a reduced felony charge of Theft $1,500–$20K in violation of Texas Penal Code § 31.03 (2011).

## B.

On September 15, 2015, a few months after Villareal pled guilty, the Department of Homeland Security ("DHS") served her with a Notice to Appear. The Notice charged her as subject to removal from the United States

2

for failing to comply with the conditions of the nonimmigrant status under which she was admitted. Villareal retained the Law Offices of Mana Yegani and was represented by attorneys Vanessa Alfaro and Damaris Betancourt in removal proceedings before an immigration judge.

Villareal, accompanied by Alfaro, first appeared before the immigration judge on February 3, 2017—almost a year and a half after receiving the Notice to Appear. At this hearing, Villareal conceded removability. She appeared again with Alfaro on May 2, 2017, to file an application to adjust her immigration status to that of a permanent resident on the basis that she is married to a U.S. citizen. DHS subsequently filed a brief arguing that Villareal's theft conviction was a "crime involving moral turpitude," which made her ineligible for adjustment of status absent a waiver of inadmissibility. On Villareal's behalf, Betancourt then filed a brief that agreed with DHS's position, and sought a waiver of inadmissibility.

Villareal, this time accompanied by Betancourt, appeared before the immigration judge again on August 2, 2018, and testified in support of her applications for adjustment of status and waiver of inadmissibility. Villareal's husband also testified that she is a good mother, and that he has multiple sclerosis ("MS"), so the family relies heavily on her. The immigration judge was displeased with Villareal's testimony, however, and rebuked her from the bench:

> The court would have expected contrition, what [Villareal] has learned, demonstration that this is never going to happen. What I saw instead was a very combative woman on the stand. Now this particular court is very accommodating with adjustments. The court particularly asked questions to give [her] opportunity to demonstrate contrition, and instead the court continued to see a combative woman on the stand who, quite frankly, it appeared as if [she] felt she was victimized, and that is not demonstrated by the record. . . . I am

> particularly concerned with [Villareal's] testimony in my court. [She] was instructed to tell the truth. [She] was instructed to listen to the questions that were asked of her. . . . It was not until she was confronted with the police report that this court learned that there were 19 transactions.

The immigration judge expressed that because of Villareal's testimony, the "inquiry for the court [was] made much more difficult than it should have been," and that she was "going to have to deliberate on this." The immigration judge then reset the hearing for a week later.

As planned, Villareal appeared with Betancourt before the immigration judge the following week on August 9, 2018. The immigration judge began by expressing that she found Villareal's "husband's situation very sympathetic," that she "quite frankly . . . liked him a lot," and "found his testimony to be very genuine." But because the inquiry did not "end[] there," the immigration judge informed Villareal that she would be ordering her removed. The immigration judge then proceeded to announce her oral decision.

In her oral decision, after recounting Villareal's criminal scheme, the immigration judge expressed that she found it "alarming" that Villareal "engaged in this criminal activity with two of her children present" and "recruited her family members, including her brother and her spouse who is suffering from MS" to engage in the scheme with her. She proceeded to find Villareal "not credible," and "[m]ost notably, . . . not forthright, candid, or truthful regarding her criminal behavior":

> During direct examination she attempted to minimize her criminal conduct. This continued on cross-examination. When asked specific questions by [DHS] regarding the amount of times [she] engaged in her fraudulent scheme at Walmart, she maintained that the behavior only happened on two occasions. The attorney for [DHS] gave [her] several

opportunities to correct her testimony. Despite this, she neglected to be truthful and forthright with the court. It was not until she was presented with the incident investigation report revealing that she in fact engaged in these transactions on 19 different occurrences that she indicated that possibly it was more than two occasions. Curiously, however, [she] became combative and transferred blame to the victim, in this case Walmart, inferring that there was some type of conspiracy or improper behavior by Walmart to entrap or exaggerate [her] criminal behavior, even going so far as saying that the loss prevention officers at Walmart were conspiring or working to get her deported. The court is struck by this. Even when [she] was confronted with her criminal behavior, she still attempted to transfer the blame to others.

The immigration judge's recitation and admonition of Villareal's dishonesty did not end there:

> [Villareal] initially testified that the transactions involved . . . diapers for the baby or videogames or things that were used in the household . . . [I]t wasn't until repeated questioning that the court learned that [she] was actually engaging in an even more complicated . . . scheme and that items were taken from Walmart and then resold at a flea market. . . . The initial impression the court received was that [she] was taking items to benefit her young children because of financial circumstances. The actual factual circumstances reveal that [she] was engaging in a complicated and complex organized scheme to take items from Walmart and then later profit on those items. They were not for personal use of the family. This was an organized and calculated criminal enterprise, so much so that the respondent recruited her brother and her husband to engage in this behavior with her.

The immigration judge labeled Villareal's theft scheme as "calculated and, quite frankly, a bit diabolical." She reiterated that she found it "significant" that Villareal was "untruthful regarding the extent of her criminal behavior"

and "even more significant" that "this lack of candor and deception underlines and underscores [her] clear lack of remorse or accountability for her actions." She then addressed Villareal's demeanor: "[Villareal] at many times was defiant, obstinate, and confrontational. The court observed [her] during [DHS's] closing arguments. The court was disappointed to see [her] glaring at [DHS's] counsel. This behavior does not represent someone who is contrite or remorseful for her actions."

After concluding that "[f]or these reasons and more, under the totality of the circumstances," Villareal is not credible, the immigration judge turned to Villareal's application for a waiver of inadmissibility. She explained that a grant of this waiver "requires a balancing of favorable and unfavorable discretionary factors," and that she had "already indicated several unfavorable factors, including [Villareal's] lack of credibility, lack of contrition, and lack of responsibility for her actions." On the other hand, the social and humane considerations in Villareal's favor were that her husband and children are U.S. citizens, and that her husband has MS and is "highly dependent" on her. The immigration judge found, however, that these favorable factors did not outweigh the bad:

> [Villareal] has engaged in what the court considers considerable criminal behavior. This was not an isolated lack of good judgment. This was 19 transactions calculated and designed to maximize the criminality. [Villareal] carelessly included her children in this scheme by bringing them with her while she engaged in criminal behavior. The court finds this fairly significant. [She] also encouraged her husband to engage in this behavior and put him at risk as well. This is fairly significant given that [her] husband suffers from MS. The court does find [her] family ties to be significant and is sympathetic to the disruption of the family unit should [she] be removed. But [her] equities are not outweighed by the aggravating factors that are present here. It is clear [she] has

not taken responsibility for her actions. She continues to defer blame to others. She is defiant, confrontational, obstinate on the stand, and it is not in the best interest of the United States for the court to grant her a waiver.

Before denying Villareal's applications for adjustment of status and waiver of inadmissibility, and ordering her removed, the immigration judge noted in conclusion: "[Villareal] has provided no explanation for her actions other than 'it seemed easy enough to do.' There is no indication by [Villareal] that she would not engage in such behavior in the future if the opportunity presented itself again."

## C.

Villareal retained new counsel, Rosa Acevedo, to appeal the immigration judge's denial of her applications. After the BIA affirmed the immigration judge, Villareal once again retained new counsel. With the assistance of her new counsel, she moved the BIA to reopen her removal proceedings on the basis that both Betancourt and Acevedo provided ineffective assistance of counsel. The BIA denied the motion. Villareal now petitions us to review that decision.

## II.

We review the BIA's denial of a motion to reopen for abuse of discretion.[1] *Eneugwu v. Garland*, 54 F.4th 315, 319 (5th Cir. 2022). Under this highly deferential standard, we uphold the BIA's denial unless it is "capricious, irrational, utterly without foundation in the evidence, based on legally erroneous interpretations of statutes or regulations, or based on

---

[1] Villareal also asked the BIA to reopen her case using its *sua sponte* authority. We lack jurisdiction to review the BIA's discretionary decision not to invoke its *sua sponte* authority. *Eneugwu*, 54 F.4th at 319–20.

unexplained departures from regulations or established policies." *Ramos-Portillo v. Barr*, 919 F.3d 955, 958 (5th Cir. 2019) (citation omitted).

### III.

### A.

The BIA allows an alien facing deportation to bring an ineffective assistance of counsel claim through a motion to reopen his removal proceedings.[2] *Mai v. Gonzales*, 473 F.3d 162, 165 (5th Cir. 2006) (citing *In re Assaad*, 23 I. & N. Dec. 553, 556 (BIA 2003); *In re Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988)). To establish such a claim, the alien must: (1) provide an affidavit attesting the relevant facts, including a statement of the terms of the attorney-client agreement; (2) inform counsel of the allegations and allow counsel an opportunity to respond; and (3) file or explain why a grievance has not been filed against the offending attorney. *Id.* He must also demonstrate that the counsel's actions were prejudicial to his case. *Id.*

### B.

Villareal's first claimed error is that Betancourt provided ineffective assistance of counsel by not adequately preparing her to testify before the immigration judge, and that Acevedo provided ineffective assistance of counsel by not raising this error on appeal. According to Villareal, Betancourt only met with her one time before the hearing, only asked a few limited

---

[2] Villareal alleged an ineffective assistance of counsel claim under both *Lozada* and the Due Process Clause of the Fifth Amendment. "Although an alien has no Sixth Amendment right to effective counsel during removal proceedings, this court has repeatedly assumed without deciding that an alien's claim of ineffective assistance may implicate due process concerns under the Fifth Amendment." *Mai*, 473 F.3d at 165 (internal citations omitted). "While the source and extent of this due process right remain unclear, we need not resolve this ambiguity in this case" because the BIA allows ineffective assistance of counsel claims under *Lozada*. *Id.*

questions about her background, and did not tell her the types of questions that DHS and the immigration judge would ask her. She also says that she informed Betancourt that she "was scared, anxious about testifying in court, and did not feel ready to testify," because of previous trauma she experienced, but that Betancourt "ignored [her] concerns and told her to simply not worry about the proceedings and that everything would be fine."

The BIA interpreted Villareal's argument as "[Betancourt] should have anticipated that [previous trauma] would result in [Villareal's] inaccurate description of the nature and frequency of the fraudulent transactions she engaged in." The BIA rejected this argument: "[Villareal] admitted the actual facts on cross-examination, which undercuts the argument that her trauma affected her ability to accurately recount the transactions underlying her conviction." The BIA's conclusion that the claimed error did not prejudice Villareal's case is supported by the evidence. Accordingly, the BIA did not abuse its discretion.[3] *See Eneugwu*, 54 F.4th at 319 (providing that under the abuse of discretion standard, we uphold the BIA's denial of a motion to reopen unless it is, *inter alia*, "utterly without foundation in the evidence") (citation omitted).

## C.

Villareal's second claimed error is that Acevedo provided ineffective assistance of counsel by failing to dispute on appeal that her theft conviction was a crime involving moral turpitude ("CIMT").[4] She essentially argues

---

[3] The BIA also noted that Betancourt produced evidence disputing the accusation that they only met once. The Government likewise raises this evidence in its brief here. Curiously, Villareal does not acknowledge this evidence in either of her briefs before this court.

[4] Villareal does not argue that Betancourt provided ineffective assistance of counsel by conceding that her conviction was a CIMT. In *In re Diaz-Lizarraga*, 26 I. & N. Dec. 847, 853 (BIA 2016), the BIA determined that "a theft offense is a crime involving moral

that her application for adjustment of status was denied because her waiver of inadmissibility was denied, but that she did not need a waiver of inadmissibility because the conviction was not a CIMT. Accordingly, she seeks a remand so that the immigration judge can rule on her application for adjustment of status. The BIA rejected this claim for two reasons: (1) Villareal did not show that her conviction was not a CIMT; and (2) Villareal did not demonstrate that she was prejudiced by the claimed errors.

The Attorney General has the discretion to adjust an alien's status to that of a lawful permanent resident if: (1) the alien makes an application for such adjustment; (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and (3) an immigration visa is immediately available to the alien at the time his application is filed. 8 U.S.C. § 1255(a). An alien who has committed a CIMT is generally inadmissible. *Id.* § 1182(a)(2)(A)(i)(I). Therefore, to receive an adjustment of status, an alien who has committed a CIMT must receive a waiver of inadmissibility under section 212(h) of the Immigration and Nationality Act. *Id.* § 1182(h).

While adjustments of status are discretionary, immigration judges ordinarily grant adjustment when the requirements are met and there are no "adverse factors." *In re Arai*, 13 I. & N. Dec. 494, 496 (BIA 1970). But if there are adverse factors, "it may be necessary for the applicant to offset

---

turpitude if it involves an intent to deprive the owner of his property either permanently or under circumstances where the owner's property rights are substantially eroded." This was the law in 2018 when Betancourt conceded that Villareal's conviction was a CIMT. But in 2019—before Acevedo briefed Villareal's appeal—this court held that *Diaz-Lizarraga* does not apply retroactively. *See Monteon-Camargo v. Barr*, 918 F.3d 423, 430–31 (5th Cir. 2019). Because Villareal was convicted before the BIA decided *Diaz-Lizarraga*, she submits that *Monteon-Camargo* clarifies that her offense was not a CIMT, and that Acevedo erred by not raising this on appeal.

these by a showing of unusual or even outstanding equities." *Id.* "Generally, favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion." *Rodriguez-Gutierrez v. I.N.S.*, 59 F.3d 504, 509 (5th Cir. 1995) (quoting *In re Arai*, 13 I. & N. Dec. at 496).

Even if Villareal's conviction was not a CIMT, it would still be an adverse factor in her application for adjustment of status. The immigration judge would then consider whether Villareal offset this adverse factor by showing unusual or outstanding equities, like family ties and hardships. This is effectively the balancing test that the immigration judge conducted in denying Villareal's application for a waiver of inadmissibility. *See supra* p. 6–7. Given the extreme disdain that the immigration judge expressed in reaching that decision, it is likely that Villareal's application for adjustment of status would have the same fate. The BIA did not abuse its discretion in concluding that any error regarding the classification of Villareal's conviction as a CIMT did not prejudice the outcome in this case.

The petition for review is DENIED.